# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TYLER J. QUINONES,

                Plaintiff,

v.

TRACY THOMPSON, ANNE M.
ZULEGER, and THOMAS
POLAKOWSKI,

                Defendants.

Case No. 20-CV-429-JPS

**ORDER**

Plaintiff Tyler J. Quinones ("Plaintiff") initially filed this case pro se on March 19, 2020. ECF No. 1. Counsel for Plaintiff filed a notice of appearance on February 25, 2021, and then filed an amended complaint on March 24, 2021, ECF No. 22. This case was reassigned to this branch of the Court on August 25, 2021.

On October 7, 2022, Plaintiff filed a corrected second amended complaint following the Court's granting in part of certain Defendants' motion for judgment on the pleadings. ECF Nos. 61, 63 The amended complaint names Defendant APNP Tracy Thompson ("Thompson"), Defendant Anne M. Zuleger ("Zuleger") (collectively the "State Defendants"), and RN Thomas Polakowski ("Polakowski") for a claim of deliberate indifference to Plaintiff's serious medical needs. ECF No. 62. On October 14, 2022, the Court entered a scheduling order with summary judgment motions due on or before April 3, 2023. ECF No. 64.

On April 3, 2023, the State Defendants and Defendant Polakowski filed separate motions for summary judgment, ECF Nos. 67, 74. Following

an extension, Plaintiff filed a joint brief in opposition on May 8, 2023. ECF No. 82. In his brief, Plaintiff clarified that he did not oppose summary judgment as to Defendant Zuleger. *Id.* at 2 n.1. On May 9, 2023, the State Defendants filed a joint stipulation to dismiss Defendant Zuleger. ECF No. 85. On May 22, 2023, Defendant Thompson and Defendant Polakowski each filed separate reply briefs in support of their motions for summary judgment. ECF Nos. 87, 88.

The Defendants' motions for summary judgment are now fully briefed and ready for disposition. For the reasons explained in detail below, the Court will grant the respective motions for summary judgment and will dismiss this case.

## 1. LEGAL STANDARD – SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## 2.    FACTUAL BACKGROUND

In compliance with the Court's order, the parties submitted a stipulated set of joint facts. ECF No. 69. As such, the following facts are taken directly from the parties' stipulated facts with only minor edits for grammar and formatting. Defendants also included a separate page of disputed facts as allowed by the Court's scheduling order, *see* ECF No. 64 at 2, which the Court will address in its analysis. The Court does not include, however, Plaintiff's nearly thirteen pages of background facts that he included in his summary judgment motion in direct contradiction to this Court's summary judgment protocols. The Court's scheduling order provided the following requirements:

> The parties should omit a facts section from their briefing; the Court will only consider the single, agreed-upon statement of facts. Any disputed facts must be itemized separately and supported by each party's separate pinpoint citation to the record. Itemized disputed facts may not exceed one (1) page per party.

*Id.* Plaintiff's submission did not in any shape or form comply with this requirement and does not seek leave of the Court to depart from the standard procedure. As Defendants indicate, the parties spent significant time preparing the joint statement of facts. *See* ECF No. 88 at 2–3. Plaintiff did not attempt to explain if his background facts are disputed (or taken out of context) and does not attempt to explain his departure from the Court's instructions. The Court acknowledges that Plaintiff submitted a letter to explain his failure to comport with the protocols. ECF No. 90. The Court is of course sympathetic to family emergencies that occur in the lives of parties and their counsel. However, addressing the issue nearly two months after the motions were briefed is insufficient to excuse compliance. If

counsel for the Plaintiff required additional time to adequately prepare a responsive brief, he needed to have timely requested an extension. As such, the Court does not include these facts based on Plaintiff's non-compliance with the Court's order.

## 2.1 Defendant Zuleger[1]

Defendant Zuleger was previously employed by DOC as a Nurse Clinician 2 at Kettle Moraine Correctional Institution ("KMCI") from September 2012 to February 2020. Prior to this, Zuleger had been employed by DOC since January 2011 and by the State of Wisconsin since 1997. Zuleger is no longer employed by the State of Wisconsin. Zuleger has been continuously licensed as a registered nurse in the State of Wisconsin since March 2008. In Zuleger's capacity as a Nurse Clinician 2, her responsibilities included, but were not limited to, provision of skilled nursing care to patients by providing patient assessment and treatment, assistance to the physician in providing medical services, management of medications, provision of emergency care, and maintenance of medical records.

As a registered nurse, Zuleger cannot diagnose patients, but she can provide her impression based on her training and expertise. On May 3, 2019, Zuleger saw Plaintiff at approximately 6:11pm for the first time for a nurse sick call to address complaints of lower back pain, hip pain, and pain shooting down his left leg. Plaintiff reported no injury to Zuleger and stated he had been doing stretches and took naproxen in the morning and at around 3 p.m. Zuleger provided Plaintiff with muscle rub and an ice pack for pain relief. Zuleger also provided him with education on stretching

---

[1]As indicated below, Plaintiff does not oppose summary judgment for Defendant Zuleger. The Court includes the facts related to Zuleger for context of Plaintiff's overall treatment history.

Case 2:20-cv-00429-JPS   Filed 07/28/23   Page 4 of 28   Document 91

exercises and helped him stretch, noting he was tight and unable to achieve a good stretch. As such, Zuleger encouraged him to continue with the stretches, Zuleger also encouraged him to continue with the use of naproxen, ice, and muscle rub for pain relief. Zuleger forwarded the note from her visit with Plaintiff to APNP Thompson for review and to consider adding him to her schedule, since Plaintiff was requesting further evaluation for his back pain. Later that day, Zuleger followed up with Officer Wachowiak on Plaintiff's housing unit to see how he was doing. Officer Wachowiak noted that Plaintiff had requested ice during medication pass, which was provided. HSU staff can only see an inmate patient for a limited amount of time, so sometimes HSU will call housing unit staff to see how the patient is functioning in their day-to-day activities.

The next time Zuleger saw Plaintiff related to his complaints of back pain was on September 23, 2019, which was for vitals check prior to his MRI screening. On October 31, 2019, Zuleger received a Health Service Request ("HSR") that Plaintiff had submitted in which he stated he wanted to get an epidural injection as soon as possible because he had a reclassification hearing in November and may be leaving KMCI. Zuleger responded by letting him know that HSU does not control the offsite schedule; however, if he was sent to another facility, they could still transport him to his offsite appointment for an epidural injection or schedule an appointment locally.

On December 11, 2019, Zuleger received another HSR from Plaintiff in which he asked about follow-up care for his back after he received the epidural injection. He inquired about physical therapy and noted that the pain in his left buttock was a little better and asked if he would need another injection in a few months. Zuleger responded by letting him know that APNP Thompson ordered physical therapy the day prior, and a follow-up

with Dr. Hoftiezer, another DOC provider, was scheduled for 4-6 weeks. Zuleger did not have any further involvement in Plaintiff's care for his complaints of back pain after the December 11, 2019 response to his HSR. As a Nurse Clinician 2, Zuleger does not have the authority to order an MRI for Plaintiff. This would need to be ordered by an Advanced Care Provider ("ACP") with prescriptive authority.

As a Nurse Clinician 2, Zuleger also does not have any control over scheduling. Scheduling in HSU is handled by the Medical Program Assistant Associate ("MPAA"). Once an ACP writes an order, the order is given to the MPAA for scheduling. Scheduling for offsite appointments, such as an MRI, are made based on the outside provider's schedule.

## 2.2 APNP Thompson

Thompson is employed by DOC's Bureau of Health Services as an Advanced Practice Nurse Prescriber ("APNP") at Oshkosh Correctional Institution. Prior to this, Thompson was an APNP at KMCI from May 2017 to March 2022. Prior to this, Thompson was employed by DOC as a Registered Nurse from 2000 to 2012. Thompson has been continuously licensed in the State of Wisconsin as an Advanced Practice Nurse Prescriber since July 20, 2012, and a registered nurse since February 23, 1996. An APNP, like a medical doctor, is an ACP.

## 2.3 Health Service Requests

When an inmate has a medical concern, wishes to communicate with medical staff, and/or requests to be seen by HSU staff, he fills out a Health Service Request ("HSR") form and submits it to the HSU. The HSRs are triaged by nursing staff. Nursing staff uses their training and judgment when triaging the HSRs and prioritizing appointments and inmate needs.

Sometimes, inmates will use interview/information request forms instead of HSR forms. In these cases, HSU processes interview/information requests in the same way they process HSRs. Once nursing staff has triaged and responded to an HSR, it is placed in the inmate's personal request folder portion of the medical record. A response will indicate whether the inmate is scheduled to be seen, whether the HSR is referred to another staff member, or referred for copies or a record review, or whether education materials are attached. The responder may also provide written comments. Even though an HSR may be directed to a specific staff member, HSRs are always triaged in the same manner for patient care and safety. An HSR placed in a pile for a certain staff member may contain a request for emergent care that cannot wait. Any HSRs or requests Plaintiff directed to Thompson would have been first reviewed by nursing staff.

Submitting numerous Health Services Requests related to the same issue does not increase the priority of the inmate being seen by health services staff unless the requests indicate a significant or concerning change in condition.

### 2.4    Copayments

Unless an exception applies, inmate patients are charged a $7.50 Copayment for each instance where a face-to-face contact with a health care provider is the result of an inmate patient-initiated request for services. Copayments are not charged for health care records review appointments, copies of documents, requests to amend/correct personal health information ("PHI"), requests that communication of PHI be done in an alternate manner, requests for restriction on use and disclosure of PHI, and requests for an accounting of disclosure of PHI made without authorization.

### 2.5 Importance of Nursing Evaluations

Nursing staff at KMCI are the first point of contact for patient medical issues or concerns. There were over 1,100 inmates housed at Kettle Moraine during the timeframe relevant to this lawsuit, and a limited number of providers. It is normal for nursing staff in prison to advise a patient to try something to address the problem and instruct the patient to contact HSU again if the problem is not resolved.

When nursing staff sees a patient, they assess and treat what the patient presents with based on their observations and examination. Nursing evaluates their concerns and their symptoms and follow the available nursing protocols, which are written procedures developed by the Bureau of Health Services to serve as a guide for patient care. Nursing protocols provide a practice of nursing triage that is designed to help and assist the nursing staff in the triage process.

### 2.6 Plaintiff's Treatment at DCI

Plaintiff was returned from extended supervision on October 30, 2018 and was brought to Dodge Correctional Institution ("DCI"). On November 9, 2018, Plaintiff was seen for his intake history and physical by APNP Nathan Tapio at DCI. Among several other complaints, Plaintiff complained of chronic low back pain. He reported that the pain stemmed from a motor vehicle accident when he was nineteen and he was being managed by Advanced Pain Management in Milwaukee, Wisconsin. He had tried burst steroid therapy and non-steroidal anti-inflammatory drugs ("NSAIDs"). He denied specific radicular symptoms but did report pain radiating from his right buttock region. He believed he had some scoliosis and described previous sacralization of his lumbar spine, which is a condition where the base of the spine has fused to the top of the pelvis.

He had previously sought chiropractic care and physical therapy in Muskego, Wisconsin at age nineteen. He denied further weakness, numbness, or bowel or bladder dysfunction.

On November 12, 2018, Plaintiff underwent x-rays of his lumbar and thoracic spine. The lumbar x-rays showed transitional L5 vertebral body with otherwise no acute process. This is a fairly common congenital anomaly The thoracic x-rays came back with no acute osseous abnormality. APNP Tapio did not recommend or order an MRI. He noted that Advanced Pain Management had recommended an MRI in the past before Plaintiff was incarcerated. An offsite provider does not have authority within the institution. DOC was not required to follow outside provider recommendations unless Plaintiff's DOC provider determined it was medically necessary.

### 2.7 Plaintiff's Treatment at KMCI

Plaintiff was transferred to KMCI on February 5, 2019. During the timeframe relevant to this lawsuit (February 2019 – February 2020), there were over 1,100 inmates housed at KMCI. The other medical provider, Dr. Kelley, retired around April 2019 and Thompson was the only provider at KMCI for several months with occasional help from Dr. Tannan. Dr. Hoftiezer also provided limited coverage starting around September 2019 until he transferred to KMCI around January 2020.

On February 6, 2019, Jennifer Schicker reached out to Thompson and noted that Plaintiff had an order for a CT and asked if Thompson wanted to proceed. Thompson responded by telling her to proceed with the CT as planned by DCI. This CT was not related to Plaintiff's complaints of back pain. This CT was a follow-up for a history of right pleomorphic parotid adenoma (benign salivary gland tumors) and lymphadenopathy (swelling

of the lymph nodes). After an order for a procedure that needs to be done offsite (at a facility outside the institution) is written, the order is given to the MPAA for scheduling. The MPAA then works with the offsite provider to schedule the appointment. Thompson has no control over how quickly an offsite appointment can be scheduled, as the schedule is based on the offsite provider's schedule and availability.

On April 24, 2019, Plaintiff submitted his first HSR requesting to be seen for complaints of back pain. On April 25, 2019, Polakowski attempted to see Plaintiff, but Plaintiff waived assessment because he did not want to pay the copay. He continued to argue with Polakowski that he wanted something done immediately, but despite repeated explanations of the process, he denied assessment because he did not want to pay the copay. Plaintiff was informed the copay would be charged regardless and his provider would be advised of his decision.

On May 2, 2019, Thompson saw Plaintiff for the first time to discuss his history of lymphadenopathy and his CT results. Plaintiff entered the room complaining of back pain. Thompson explained to Plaintiff that he was in HSU to discuss the results of his CT scan and they did not have enough time to complete an assessment of his back pain.

The next day, Plaintiff was seen by Zuleger for his complaints of back pain, hip pain, and pain shooting down his left leg. He reported no injury to Zuleger. He further stated he had been doing his stretches and taking his naproxen. Zuleger provided Plaintiff with muscle rub, an ice pack, and education on stretching and naproxen. Finally, she forwarded her note to Thompson for review and consideration of an appointment with Thompson.

On May 6, 2019, Thompson wrote an order for Plaintiff to be scheduled for a follow-up appointment with Thompson in 1-2 months for his back pain. On May 8, 2019, HSM McCreedy met with Plaintiff to discuss his frequent slips to HSU and his mother calling frequently. He was informed he already knew he was scheduled to see his provider. He agreed to put in an HSR if his condition got worse and would review the copay policy.

On May 26, 2019, Plaintiff submitted an interview/information request asking when he was scheduled to see Thompson. He further complained that the stretches, naproxen, ice, and muscle rub were not helping him. Thompson responded to this request by letting him know he had an appointment scheduled with Thompson and he should use his current therapies and avoid any activities that would aggravate his pain. On June 9, 2019, Plaintiff submitted an interview/information request asking that Thompson order him an MRI and stating that the naproxen, muscle rub, stretching, and ice were not helping him. This request was triaged by Nurse Berzinski, who responded by letting Plaintiff know that he had a pending appointment with Thompson soon. Thompson cannot order an MRI or physical therapy for a patient just because they ask for it. Thompson has to be able to physically evaluate the patient to determine what is medically necessary.

On June 26, 2019, Thompson saw Plaintiff. Plaintiff reported a history of scoliosis as a child and some congenital abnormality. He wanted his back pain addressed. He wanted an MRI, an x-ray, and pain medication. At this time, Plaintiff reported that his pain started about 2.5 – 3 months prior, he believed in March. He said he had been out to court during that time and was transported in a vehicle with limited mobility for about 8

hours. He denied any other sort of trauma or injury he could relate to. Plaintiff reported that his pain was along his left SI (sacroiliac) joint that radiated down the back of his left leg and calf to his ankle. He claimed that certain movements raised his pain to an 8/10, including bending over and straightening his leg. He said naproxen helped his pain for an hour or two and he avoided certain activities to prevent discomfort. He complained about some discomfort going from sitting to lying and lying to sitting. Thompson also noted a slight curvature of his thoracic spine mostly on the right. On palpation, Plaintiff noted discomfort at L5-S1 as well as at the left SI joint. His leg flexion was beyond 100 degrees and his extension was intact. Bilateral straight leg raises caused discomfort in his left SI joint. The muscle strength in both legs was equal and strong. Thompson explained to him that he had no injury or trauma/fall to cause Thompson to believe he had any significant pathological cause to his pain. His recent x-rays were also negative for both his lumbar and thoracic spine. He does have some scoliosis to his thoracic spine. Thompson added a prescription for acetaminophen for breakthrough pain and would schedule him with physical therapy. Thompson also noted that a TENS unit could be beneficial to him, which would be determined by the physical therapist. Thompson would follow-up with Plaintiff after physical therapy.

Similar to the process of scheduling offsite appointments, when Thompson writes an order for physical therapy, the MPAA takes the order and places the inmate on the list for the physical therapist. The physical therapist often has a long list of patients that need evaluation and treatment, so it is common for an inmate to have to wait several months to get in with the physical therapist. Around July 10, 2019, Plaintiff submitted an interview/information request asking when he would be seen by physical

therapy. Physical Therapist Ramirez responded by letting Plaintiff know he was on the wait list and would be seen in the order he was placed on the list.

On August 2, 2019, Plaintiff was seen by physical therapist Ramirez for his inpatient evaluation. Plaintiff was educated on proper body mechanics, slow gentle stretches, and they set up goals for physical therapy. Plaintiff had additional sessions with physical therapist Ramirez on August 9, 16, 23, 30, September 6, and 9, 2019. On August 16, 2019, Plaintiff was issued a TENS unit and was educated on a variety of stretches. Plaintiff was discharged from physical therapy on September 9, 2019 with a referral back to his provider, as he reported no benefit from physical therapy.

On September 10, 2019, Polakowski attempted to see Plaintiff for continued complaints of pain, but Plaintiff refused assessment because he did not want to pay the copay. As such, he was referred to his ACP for further assessment. On September 18, 2019, Plaintiff was seen by Dr. Tannan, who noted that Plaintiff was walking with a slight limp favoring his left side, his forward bend was restricted, his straight leg raises were also restricted on the left side, and his deep tendon reflexes were well maintained and equal bilaterally. Dr. Tannan prescribed Plaintiff a Medrol dose pack, also known as methylprednisolone. After Plaintiff's appointment with Dr. Tannan, Dr. Tannan and Thompson discussed Plaintiff's plan of care. They agreed Thompson would put in an order for an MRI because he had failed conservative therapy with NSAIDs, Tylenol, and physical therapy.

On September 20, 2019, Thompson submitted an order to send Plaintiff for an MRI of his lumbar spine. No medical provider ever ordered an MRI for Plaintiff's back pain before this Order was placed on September

20, 2019, by Thompson. On October 24, 2019, Plaintiff underwent an MRI of his lumbar spine, which showed prominent left subarticular disc protrusion at L4-L5. A protrusion is a disc fragment that pushes out of the disc space but remains connected to the disc. Agnesian Healthcare noted Plaintiff may benefit from a fluoroscopically guided left L5 transforaminal steroid injection if clinically indicated. On October 25, 2019, Thompson sent Plaintiff a letter informing him that his MRI showed disc protrusion at L4-L5. Since he had failed conservative therapy, Thompson informed him we would schedule him for an epidural steroid injection.

On December 4, 2019, Plaintiff went to Agnesian Healthcare – Pain Center where he underwent a lumbar interlaminar epidural steroid injection at the L4-L5 level. When he returned to the institution, he told nursing staff that he was already feeling better. On December 10, 2019, Thompson placed orders for a follow-up with Dr. Hoftiezer in 2-4 weeks after his injection and to try physical therapy again. Plaintiff was seen by Dr. Hoftiezer based on Dr. Hoftiezer's availability, as Dr. Hoftiezer was providing limited coverage to KMCI at this time and had a more flexible schedule. Plaintiff was transferred to Dr. Hoftiezer's care around this time.

On January 7, 2020, Plaintiff saw Dr. Hoftiezer for a follow-up after his steroid injection. Plaintiff reported he got 50-60% improvement from his injection but had "lost a little ground" since he had received it. He still reported ache in his left lower buttock and the top of his leg, but now the pain and numbness were greatly diminished below that. Plaintiff saw physical therapist Ramirez for another round of physical therapy on January 15, 23, 30, February 6, and 13, 2020. On February 18, 2020, Plaintiff transferred back to DCI, and on February 20, 2020, he was transferred to the

Chippewa Valley Correctional Treatment Facility. After Plaintiff left KMCI, Thompson had no further involvement in his medical care.

### 2.8     Nurse Polakowski

In 2019, Defendant Polakowski was a registered nurse working for the State of Wisconsin at KMCI as a contract employee through a placement service. As a registered nurse, Polakowski could not make medical diagnoses. As a registered nurse, Polakowski could not prescribe medicine, prescribe physical therapy, or order imaging studies. Polakowski had three encounters with Plaintiff regarding his complaints of lower back and radiating pain. Those encounters were on April, 25, 2019, July 31, 2019, and September 10, 2019. On each of those encounters, Plaintiff refused to have a physical assessment conducted by Polakowski.

The April 25, 2019 encounter was a result of an April 24, 2019 HSR from Plaintiff reporting "severe back pain". Plaintiff refused a nursing assessment by Polakowski because he did not want to pay a co-pay, did not feel a nursing assessment could do anything for him, and was already scheduled to see the nurse practitioner. Plaintiff decided to wait for the appointment with the nurse practitioner. Polakowski wrote up a Refusal of Recommended Health Care form which would have alerted the advanced care practitioner of that situation.

The July 31, 2019 encounter was a result of a July 29, 2019 HSR from Plaintiff reporting ongoing escalating back pain and radiating symptoms down his legs. Plaintiff refused a nursing assessment by Polakowski due to the co-pay. At that time Plaintiff had been referred to physical therapy but it had not yet started. Polakowski agreed to inquire of the physical therapist when therapy would start.

The September 10, 2019 encounter was a result of multiple HSR's from Plaintiff, reporting increasing lower back and radiating pain that was not relieved by physical therapy or any other previous treatments. At that time, physical therapy had been completed as of the last session on September 9, 2019. Plaintiff refused a nursing assessment by Polakowski, instead seeking a referral to the advanced care practitioner. Plaintiff refused the nursing assessment due to the co-pay.

Polakowski reviewed the physical therapy discharge note with Plaintiff. Polakowski also recommended palliative care of alternating warm moist compresses and ice for comfort. Polakowski made the referral for Plaintiff to be seen by the Advanced Care Provider.

### 2.9    Plaintiff

Plaintiff maintains his condition got progressively worse over the course of five months at KMCI. Plaintiff's condition was extremely painful and nearly incapacitating during the course of his incarceration at KMCI. Polakowski informed Thompson on April 25, 2019 that Plaintiff did not want to pay the copay for the same condition, and this refusal along with Plaintiff's documentation that he was getting progressively worse was passed onto Thompson. On July 31, 2019, Polakowski passed similar information along to the physical therapist. On September 10, 2019, Polakowski passed similar information along to the ACP, who at the time was Dr. Tannan. Thompson took no action in response to the co-pay refusals. Thompson refused to address Plaintiff's severe complaints of back pain at the May 2, 2019 appointment, despite Plaintiff being in front of her for a medical appointment. Plaintiff's communications with the HSU indicated a serious medical condition that appeared to be getting

progressively worse. Plaintiff felt that physical therapy made him worse, not better. No benefit was noted from physical therapy.

Plaintiff maintains that nothing provided by the defendants did anything to alleviate his progressively worsening complaints of radiculopathy and that none of the defendants consulted with the medical director or a doctor until September of 2019, despite Plaintiff's complaints of progressively worsening radiculopathy.[2]

3.    **ANALYSIS**

The State Defendants and Defendant Polakowski each brought separate motions for summary judgment seeking dismissal of the Eighth Amendment claim for deliberate inference to a serious medical need. ECF Nos. 67, 74. As an initial matter, Plaintiff does not oppose summary judgment for Defendant Zuleger because the parties agreed to dismiss her from this action with prejudice and without costs. ECF No. 82 at 2 n.1. As such, the Court will adopt the parties' stipulation and dismiss Defendant Zuleger with prejudice and without costs. *See* ECF No. 85.

Based on the Court's review of Defendants' submissions, and for the reasons explained below, the Court will grant Defendants' respective motions for summary judgment and will dismiss this case.

---

[2] The parties' joint statement of facts also includes multiple exhibits. ECF No. 69 at 17–38. The Court does not have the time, the inclination, or the resources to sift through the compendium of documents. To the extent that the parties intended these exhibits to be "facts," simply attaching documents without more is insufficient to meet the Court's summary judgment protocols and is further inconsistent with Federal Rule of Civil Procedure 56. Therefore, the Court relies only upon the parties' statement of undisputed facts as opposed to the additional exhibits.

### 3.1 Eighth Amendment Standard

To prove that Defendants violated his rights under the Eighth Amendment, Plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that Defendants were "'deliberately, that is subjectively, indifferent'" to that condition. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when he or she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

"'A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

Under the Eighth Amendment, an incarcerated person does not have the right to direct his own course of treatment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Likewise, an incarcerated person's disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[ ] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). To defeat Defendants' motions for summary judgment, Plaintiff must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did[.]" *Id.* (quoting *Petties v.*

*Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Finally, "[a] delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" *Id.* (quoting *McGowan*, 612 F.3d at 640). To prevail on an Eighth Amendment claim alleging a delay in providing treatment, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730–31. Such evidence may include a showing in the plaintiff's medical records that "the patient repeatedly complained of enduring pain with no modifications in care." *Id.* at 731; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

### 3.2    Defendant Thompson

First, Defendant Thompson does not argue that Plaintiff did not have an objectively serious medical need. ECF No. 68 at 4. As such, for the purposes of this Order the Court will assume, without definitively ruling, that Plaintiff suffered from an objectively serious medical condition and satisfies the first prong of the deliberate indifference standard.

Second, assuming Plaintiff suffered a serious medical condition, the Court finds that no reasonable juror could find that Thompson was deliberately indifferent to Plaintiff's need for treatment. The undisputed

facts show that Thompson treated Plaintiff over an approximately six-month period for his back pain. The medical treatment that Plaintiff received during that time was not the treatment that Plaintiff wanted or subjectively believed he needed, but that fact alone is insufficient to establish deliberate indifference.

The Court begins with the well-established rule that when considering claims of deliberate indifference, the Court must give deference to a medical professional's judgment regarding treatment decisions. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood,* 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998)). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006). Federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe,* 631 F.3d at 857; *Sain,* 512 F.3d at 895. "But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." "When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (emphasis in original).

As relevant here, Thompson's first interaction with Plaintiff was ordering a CT, unrelated to his back pain, for a follow-up for a history of right pleomorphic parotid adenoma (benign salivary gland tumors) and lymphadenopathy (swelling of the lymph nodes). ECF No. 69 at 8. Following the CT, Thompson first met with Plaintiff on May 2, 2019, to discuss his history of lymphadenopathy and his CT results. *Id.* at 9. Plaintiff wanted to discuss his back pain at his appointment, however Thompson explained that there was only time to discuss the CT. *Id.* Plaintiff was seen the following day for his back pain issue. *Id.*

The following day Plaintiff saw Zuleger where he received muscle rub, an ice pack, and education on stretching and naproxen. Zuleger forwarded her note to Thompson for review and consideration of an appointment. *Id.* On May 6, 2019, Thompson wrote an order for Plaintiff to be scheduled for an appointment within one to two months for his back pain. *Id.* On May 26, 2019, Plaintiff submitted another request and notified Thompson that the stretches, naproxen, ice, and muscle rub were not helping him. *Id.* Thompson responded that Plaintiff had an appointment scheduled and that he should avoid any activities that would aggravate his pain. *Id.* at 10. On June 9, 2019, Plaintiff sent another request, that was triaged by a nurse, in which he sought an MRI. *Id.*

Plaintiff saw Thompson for an appointment on June 26, 2019. *Id.* Based on Thompson's assessment, Thompson added a prescription for acetaminophen for breakthrough pain, put in an order for physical therapy, and informed Plaintiff that a TENS unit could be beneficial to him if physical therapy determined it was necessary. *Id.* at 11. Thompson's plan of action was to follow up with Plaintiff after physical therapy. *Id.* Thompson had no control over the physical therapy schedule and Plaintiff

waited until August 2, 2019 to begin physical therapy. *Id.* at 12. Following multiple physical therapy sessions in August 2019, Plaintiff was discharged from physical therapy on September 9, 2019, with a referral back to his provider, as he reported no benefit from physical therapy. *Id.*

Polakowski attempted to see Plaintiff the following day on September 10, 2019, but Plaintiff refused assessment because he did not want to pay the copay. *Id.* Plaintiff was accordingly referred to his ACP for further assessment and saw Dr. Tannan on September 18, 2019. *Id.* The following day, Dr, Tannan met with Thompson to discuss Plaintiff's plan of care. *Id.* They agreed Thompson would put in an order for an MRI because Plaintiff had failed conservative therapy with NSAIDs, Tylenol, and physical therapy. *Id.* at 12–13. On September 20, 2019, Thompson submitted an order for Plaintiff to receive an MRI of his lumbar spine. *Id.* at 13.

On October 14, 2019, Plaintiff underwent an MRI, which showed prominent left subarticular disc protrusion at L4-L5. A protrusion is a disc fragment that pushes out of the disc space but remains connected to the disc. *Id.* Agnesian Healthcare noted Plaintiff may benefit from a fluoroscopically guided left L5 transforaminal steroid injection if clinically indicated. *Id.* The following day, Thompson sent Plaintiff a letter with the MRI results and informed him that he would be scheduled for an epidural steroid injection. *Id.* Plaintiff received the injection on December 4, 2019, at the Agnesian Healthcare Pain Center, and Plaintiff told nursing staff he was already feeling better. *Id.* On December 10, 2019, Thompson placed orders for a follow-up with Dr. Hoftiezer in the two to four weeks after Plaintiff's injection and for Plaintiff to try physical therapy again. *Id.* Thompson

scheduled Plaintiff with Dr. Hoftiezer due to his more flexible schedule at the time. *Id.*

These undisputed facts do not show Thompson's deliberate indifference to Plaintiff's serious medical need. Perhaps, Plaintiff *should* have received an MRI and the injections to alleviate his pain much sooner than he did. However, Plaintiff has offered no evidence calling into question Thompson's exercise of professional judgment in treating Plaintiff. Plaintiff may have disagreed with Thompson's course of treatment, but Plaintiff's subjective believe is insufficient to prove deliberate indifference. *Johnson,* 433 F.3d at 1013. Further, Thompson provided additional facts from a non-defendant medical provider, ECF No. 70, which Plaintiff does not offer evidence to dispute. Dr. Tanner reviewed Plaintiff's medical records and provided that he did not see any actions or inactions from Thompson that departed from a reasonable standard of medical care. *Id.* at 2.

Plaintiff argues generally that the factual inferences from Plaintiff's treatment are sufficient to overcome summary judgment. The Court disagrees. Plaintiff has provided no evidence that Thompson's treatment of his condition was even negligent, let alone rose to the level of deliberate indifference. Medical professionals, whether treating inmates or not, necessarily make judgment calls about who gets treatment first and how long is reasonable to wait for any given treatment. Certainly, in a perfect world, many patients would receive medical care for many conditions faster than they currently do. However, the absence of immediate medical treatment for any type of treatment does not automatically equate to deliberate indifference. Here, the evidence shows that Thompson chose a more conservative approach to treating Plaintiff's back pain by trying pain

medication, stretching, ice packs, and physical therapy prior to ordering him the MRI and injections that ultimately gave him the pain relief he sought. The question before the Court is not whether this was the right course of treatment, and, indeed, the Court does not have the answer to that question because it has no medical expertise. Instead, the question is whether Thompson's treatment rose to the level of deliberate indifference. Based on the record before it, the Court finds that no reasonable juror could find Thompson acted with deliberate indifference to Plaintiff's medical needs. As such, the Court will grant Thompson's motion for summary judgment.

### 3.3 Defendant Polakowski

First, Defendant Polakowski does not argue that Plaintiff did not have an objectively serious medical need. ECF No. 75 at 4. As such, for the purposes of this Order the Court will assume, without definitively ruling, that Plaintiff suffered from an objectively serious medical condition and satisfies the first prong of the deliberate indifference standard.

Second, assuming Plaintiff suffered a serious medical condition, the Court again finds that no reasonable juror could find that Polakowski was deliberately indifferent to Plaintiff's need for treatment based on the undisputed facts. The Court addresses Polakowski's actions (or lack thereof) during his interactions with Plaintiff, keeping in mind that the undisputed facts show that Polakowski's actions were limited because he could not diagnose, prescribe medicine or therapy, or order imaging studies.

Polakowski had three encounters with Plaintiff regarding his lower back and radiating pain. ECF No. 69 at 15. At each encounter, he refused to allow Polakowski to conduct a physical assessment. *Id*. Plaintiff submitted

his first HSR to be seen for complaints of back pain on April 24, 2019. ECF No. 69 at 8. Polakowski attempted to see but Plaintiff waived assessment because he did not want to pay a co-pay, did not feel a nursing assessment could do anything for him, and was already scheduled to see the nurse practitioner. *Id.* Polakowski wrote up a Refusal of Recommended Health Care form, which would have alerted the advanced care practitioner of the situation. *Id.*

On July 31, 2019, Plaintiff refused a nursing assessment by Polakowski due to the co-pay. *Id.* Plaintiff at that time was still waiting to begin physical therapy and Polakowski agreed to inquire of the physical therapist when therapy would start. *Id.* On September 10, 2019, Plaintiff again refused a physical assessment by Polakowski due to the co-pay. *Id.* Polakowski reviewed Plaintiff's physical therapy discharge note with him, recommended palliative care of alternating warm moist compresses and ice for comfort, and referred Plaintiff to be seen by the ACP. *Id.* at 16.

Plaintiff's argument is conclusory and unpersuasive. He references Polakowski in only one sentence in the argument section of his brief. Plaintiff argues that he "has satisfied the subjective element by documenting that Thompson and Polakowski were aware of his severe pain and radicular complaints but failed to provide him the necessary medication to control it, the necessary treatment to alleviate it and/or the necessary diagnostic testing to identify the source of the pain generator." ECF No. 82 at 18. Plaintiff does not explain why Polakowski should be held liable for failing to provide medication or further diagnostic testing despite Polakowski's inability to do these things based on his status as a registered nurse. Plaintiff refused to allow Polakowski to perform a physical assessment on all three occasions due to the co-pay. The Court certainly

understands that a prisoner with limited funds may need to make difficult choices regarding his or her medical care as a result of co-pays. However, Polakowski's ability to treat Plaintiff was necessarily limited by Plaintiff's own refusal of a physical assessment. Based on the undisputed facts, the Court find that no reasonable jury could find that Polakowski was deliberately indifferent to Plaintiff's serious medical needs. As such, the Court will accordingly grant Polakowski's motion for summary judgment.

4.    **CONCLUSION**

For the reasons explained above, the Court will adopt the parties' stipulation of dismissal as to Defendant Zuleger and will accordingly dismiss her from this action with prejudice and without costs. The Court will grant Defendant Thompson's and Polakowski's motions for summary judgment in full, and will accordingly dismiss this action.

Accordingly,

**IT IS ORDERED** that the parties' stipulation to dismiss Defendant Anne Zuleger, ECF No. 85, be and the same is hereby **ADOPTED**; Defendant Zuleger be and the same is hereby **DISMISSED with prejudice and without costs**;

**IT IS FURTHER ORDERED** that Defendant Thompson's motion for summary judgment, ECF No. 67, and Defendant Polakowski's motion for summary judgment, ECF No. 74, be and the same are hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice.**

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of July, 2023.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge